**J. P. PRIMM**

v.

**CONTINENTAL CASUALTY COMPANY and United Van Lines, Inc.,**

**Employers Mutual Liability Insurance Company of Wisconsin, Intervenor.**

No. 4972.

United States District Court
W. D. Louisiana,
Shreveport Division.

July 6, 1956.

John P. Godfrey and Godfrey & Edwards, Many, La., for plaintiff.

Breard Snellings and Deutsch, Kerrigan & Stiles, New Orleans, La., for defendants.

Sam A. Smith and Jackson, Smith, Mayer and Kennedy, Shreveport, La., for intervenor.

BENJAMIN C. DAWKINS, Jr., Chief Judge.

The action is for damages, growing out of an accident which occurred on September 17, 1954, wherein plaintiff received serious, permanent injuries. The jury returned a verdict for plaintiff in the sum of $72,500, after a four-day trial, hotly contested by defendants, both as to liability and quantum.

Defendants now move for a new trial on two grounds: 1) that the jury was guilty of misconduct, and 2) that the

award is excessive, having resulted from passion and prejudice.

In support of their charge of jury misconduct, defendants have filed the affidavit of Robert Jenkins, manager of the New Orleans Claims Department of Continental Casualty Company. He states he questioned one of the jurors in the hallway immediately after the verdict was returned, and was told that the jury arrived at the amount of its verdict as follows:

| "22 years at $2,000 | $44,000 |
|---|---|
| Comp. | 5,000 |
| College educations for four children | 16,000 |
| Future medical expenses | 7,500 |
| | $72,500" |

Defendants complain that plaintiff had made no claim for "college educations" for his children, or for "future medical expenses", and, in any event, no award for such items properly could have been made. Hence, they urge that the verdict should be set aside and a new trial granted. Actually there was a claim for $7,500 in "future medical expenses", in Article 26 of the complaint, and the proof showed an amount greater than that probably will be incurred.

As their sole authority for attempting to impeach the verdict in this fashion, defendants cite Ft. Worth & Denver Ry. Co. v. Thompson, 5 Cir., 216 F.2d 790, 793. In that case, however, the Court refused to permit impeachment of the verdict on the ground that the jury, while actually having found plaintiff to have been guilty of contributory negligence, returned a verdict upon special issues exonerating him from such negligence, in order to avoid having the general award of damages reduced. The Court, through Chief Judge Hutcheson, said:

"The second specification as to the jury misconduct stands no better *under the settled rule of law in the federal courts, that the court will not hear a juror impeach his own verdict. The decisions,* some of which appear in note 4, supra, cited and re-

lied on by appellant for a contrary conclusion, *deal not with misconduct of the jury as such in regard to its deliberations and method of reaching the verdict,* but with the probable or possible effect upon the jury of *extraneous matters* which by *outside influences* have been brought to their attention." (Emphasis supplied.)

The Court then quoted from City of Amarillo, Texas v. Emery, 5 Cir., 69 F.2d 626, 627, as follows:

" ' * * * It is also the general rule that a juror will not be permitted to impeach his verdict. However, there are exceptions to both rules. While a juror may not testify to a matter resting in his personal consciousness, affidavits of jurors, which show overt acts constituting misconduct or that extraneous matters that might influence the jurors have been brought to their attention, are admissible.' "

In the latter case, the Court ordered a new trial because it was shown by affidavits of jurors—not a claim agent—that while the case was being tried, and even during the jury's deliberations, various jurors had discussed the case with unsworn outsiders, out of Court, or " * * went about the neighborhood collecting unsworn testimony as to the value of the property * * * ." Even in that case the Court was careful to point out:

" * * * *The question is different from what it would have been if the jurors had been called only to prove misconduct which occurred in the jury room during their deliberations. * * * "* p. 627. (Emphasis supplied.)

See also, concerning the effect of extraneous jury misconduct during a protracted trial, where jurors were subjected to all manner of outside influences, Paramount Film Distributing Corporation v. Applebaum, 5 Cir., 217 F.2d 101.

The rule we must follow here is set forth clearly in McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 784, 59 L.Ed. 1300, where the jurors had reached a "quotient verdict", by adding the amounts thought proper by each juror and dividing the total by 12:

" * * * For while by statute in a few jurisdictions, and by decisions in others, the affidavit of a juror may be received to prove the misconduct of himself and his fellows, the weight of authority is that a juror cannot impeach his own verdict. The rule is based upon controlling considerations of a public policy which in these cases chooses the lesser of two evils. When the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is made the basis of a motion for a new trial, the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were permitted to testify as to what had happened in the jury room.

"These two conflicting considerations are illustrated in the present case. If the facts were as stated in the affidavit, the jury adopted an arbitrary and unjust method in arriving at their verdict, and the defendant ought to have had relief, if the facts could have been proved by witnesses who were competent to testify in a proceeding to set aside the verdict. But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation;

to the destruction of all frankness and freedom of discussion and conference.

"The rule on the subject has varied. Prior to 1785 a juror's testimony in such cases was sometimes received, though always with great caution. In that year Lord Mansfield, in Vaise v. Delaval, I.T.R. 11, refused to receive the affidavit of jurors to prove that their verdict had been made by lot. That ruling soon came to be almost universally followed in England and in this country. Subsequently, by statute in some states, and by decisions in a few others, the juror's affidavit as to an overt act of misconduct, which was capable of being controverted by other jurors, was made admissible. And, of course, the argument in favor of receiving such evidence is not only very strong, but unanswerable —when looked at solely from the standpoint of the private party who has been wronged by such misconduct. The argument, however, has not been sufficiently convincing to induce legislatures generally to repeal or to modify the rule. For, while it may often exclude the only possible evidence of misconduct, a change in the rule 'would open the door to the most pernicious arts and tampering with jurors.' 'The practice would be replete with dangerous consequences.' 'It would lead to the grossest fraud and abuse' and 'no verdict would be safe.' Cluggage's Lessee v. Swan, 4 Bin., Pa., 150, 155; Straker v. Graham, 4 M. & W. 721.

"There are only three instances in which the subject has been before this court. In United States v. Reid, 12 How. 361, 366, 13 L.Ed. 1023, 1025, the question, though raised, was not decided because not necessary for the determination of the case. In Mattox v. United States, 146 U.S. 140, 148, 13 S.Ct. 50, 36 L. Ed. 917, 920, such evidence was received to show that newspaper comments on a pending capital case had been read by the jurors. Both of those decisions recognize that it would not be safe to lay down any inflexible rule because there might be instances in which such testimony of the juror could not be excluded without 'violating the plainest principles of justice.' This might occur in the gravest and most important cases; and without attempting to define the exceptions, or to determine how far such evidence might be received by the judge on his own motion, it is safe to say that there is nothing in the nature of the present case warranting a departure from what is unquestionably the general rule, that the losing party cannot, in order to secure a new trial, use the testimony of jurors to impeach their verdict. The principle was recognized and applied in Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, which, notwithstanding an alleged difference in the facts, is applicable here.

"The suggestion that, if this be the true rule, then jurors could not be witnesses in criminal cases, or in contempt proceedings brought to punish the wrongdoers, is without foundation. For the principle is limited to those instances in which a private party seeks to use a juror as a witness to impeach the verdict."

To the same effect are Pacific Employers Insurance Co. v. Orren, 5 Cir., 160 F.2d 1011; Brabham v. State of Mississippi, 5 Cir., 96 F.2d 210; Davis v. United States, 5 Cir., 47 F.2d 1071; and Lancaster v. United States, 5 Cir., 39 F.2d 30; see also Northern Pacific Railway Co. v. Mely, 9 Cir., 219 F.2d 199, and authorities therein cited.

█ Accordingly, we hold here that, even if defendants' allegations are true, even if they were not a sort of secondary hearsay, we cannot and must not allow the verdict to be impeached on such grounds.

█ Moreover, after thorough consideration, and full consultation with our

colleague, the Honorable Edwin F. Hunter, Jr., United States District Judge, we have concluded that henceforth, in the Western District of Louisiana, we shall consider it improper, unethical, and subject to punishment for contempt, for any one—lawyer, claim agent, or otherwise—to question jurors or discuss with them their deliberations in the Jury Room, without prior permission of the Court, to be granted only upon good cause being shown. In all cases we shall instruct jurors not to discuss such matters, and to report to us if any attempts are made to question them. We also, of course, shall instruct them to report to the Court if any dishonest, or otherwise irregular, occurrence takes place. This rule is necessitated by an increasing tendency of late, by losing litigants or their representatives, to do the very thing attempted to be done here, and we cannot tolerate it.

On the question of quantum, while first impression might indicate that the verdict is excessive—and it is indeed large—when the evidence is considered, as it must be, from the standpoint most favorable to plaintiff, an opposite conclusion is reached.

At the time of the accident, plaintiff was 44 years old, in good health and with a life expectancy of 31 years. He was uneducated but was earning about $2,200 per year as a log-truck driver, involving the heaviest kind of manual labor. He had a wife and three children to support.

He was literally crushed in the accident, in the heavy impact between the front of his truck and the large truck-van combination, operated by United Van Lines, Inc., and by a full load of logs, carried on his truck, plunging forward against the back of his cab. He was pinned in the wreckage for nearly 30 minutes, in great pain from a crushed chest and other injuries, and in panicky fear of being burned alive by gasoline dripping on and around him. All efforts to remove him failed until a chain, attached to another truck, was used to pull the cab apart from its accordion-like position.

He was taken to a hospital where he remained 26 days. X-rays revealed that a number of ribs in his left chest had been fractured. More importantly, and in addition to numerous lesser injuries, he was found to have sustained a severely bruised heart. This has resulted in permanent damage to that vital organ, producing angina pectoris. He has suffered numerous attacks since the accident, observed by the doctors, wherein he turns ashen gray, breaks out in cold sweat, becomes short of breath, his heart races, and he suffers great pain, relieved only partially by nitroglycerine or drugs. This condition, confirmed by serial cardiograms, is permanent. He is totally disabled and will be a semi-invalid from now on. His medical bills will average $20 to $30 per month, and he faces pain and humiliation the balance of his days on earth.

█ Considering these facts, and that he must reimburse his employer's compensation insurer for nearly $5,000 paid to him, or in his behalf, we do not believe the jury award is excessive, or that it resulted from passion and prejudice. It does not shock our judicial conscience, and we will let it stand. Shehee v. Aetna Casualty & Surety Co., D.C., 122 F.Supp. 1.

For these reasons, defendants' motion for a new trial is denied. Likewise, since the evidence amply supported the jury's finding of liability, defendants' motions for a directed verdict, upon which we reserved judgment, are denied. Judgment on the verdict is being signed concurrently with this ruling.