227

Henry L. BEANLAND, Plaintiff,

v.

CHICAGO, ROCK ISLAND AND PACIF-
IC RAILROAD COMPANY, et al.,
Defendants.

No. 18808–1.

United States District Court,
W. D. Missouri, W. D.

Feb. 23, 1972.

See also D.C., 345 F.Supp. 220.

Jo B. Gardner, Monett, Mo., for plain-
tiff.

Neal E. Millert, David R. Odegard, James & McCanse, Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER SETTING CASE FOR POST-TRIAL HEARING

JOHN W. OLIVER, District Judge.

### I.

This case pends on defendant's motion for new trial, or in the alternative, for remittitur of the $275,000 verdict returned in this F.E.L.A. case. Defendant has also filed an application for an evidentiary hearing accompanied by supporting suggestions in regard to its contention that certain alleged misconduct on the part of two jurors during voir dire examination allegedly deprived defendant of its "statutory and constitutional right of peremptory challenge." Defendant's application shows that it believes that it is presently entitled to examine these two jurors as witnesses at the requested post-trial hearing. We shall set the case for post-trial hearing. We shall, however, direct that the two jurors shall not be contacted for interview or called as witnesses without approval of court being first obtained.

The principles of law applicable to the question presented were recently stated by Chief Judge Becker in his memorandum and order denying a motion for new trial in Morrison v. Wilkerson, Inc., 343 F.Supp. 1319 (W.D.Mo., 1971), appeals docketed, Nos. 71–1566 and 71–1567, 8th Cir., Oct., 1971. We incorporate by reference pages 1330 – 1333 of that opinion complete with footnotes, and indicate our agreement with Chief Judge Becker's discussion of the cases cited and the questions presented.*

### II.

We add to Chief Judge Becker's discussion of the general problem in Morri-

son in order to state fully the circumstances under which the affidavit of the juror happened to have been admitted in evidence in that case and in order to make clear that the post-trial proceedings in Morrison and our direction of further proceedings in this case are consistent with the established practice of this Court.

The transcript of the hearing held April 23, 1971, in Morrison shows that the post-trial hearing in that case was limited solely to establishing a preliminary factual base from which it could be determined whether further inquiry should be made into defendant's legal contention that it was entitled to a new trial because one of the jurors in that case had failed to reveal on voir dire examination that she had in fact been a party plaintiff in a personal injury action. The Morrison post-trial transcript shows that the records of the Circuit Court of Jackson County, Missouri, (showing that the juror had been a plaintiff in a state court action) and the transcript of the voir dire examination in Morrison were both admitted in evidence without objection. The only witnesses called by the defendant were the secretary of the juror's treating doctor (to show the number of treatments and medical reports of the juror) and a claims attorney who identified the settlement figures and release of the juror's state court personal injury claim. Defendant offered no additional evidence.

Plaintiff's counsel, without the knowledge or approval of the Court, had taken an affidavit from the juror in question, which is set forth on page 1330 of Chief Judge Becker's memorandum opinion. That affidavit, which was the only evidence offered by the plaintiff, was admitted in evidence without objection.

■ We have discussed the post-trial hearing in the Morrison case in detail to make clear that the established prac-

---

* We have circulated a copy of this memorandum and order among Chief Judge WILLIAM H. BECKER, Judge WILLIAM R. COLLINSON, and Judge ELMO B. HUNTER, our active colleagues on

this Court. Each has authorized me to state his agreement with the principles of law stated and with our statement of the established practice of this Court.

tice in this Court does not contemplate that any juror will either be interviewed or examined as a witness in a post-trial hearing on a motion for new trial until and unless the moving party has first established an initial foundation of prejudice under the applicable principles of law. It follows, of course, that a movant's failure to meet the burden of proving that a juror's failure to disclose on voir dire examination was either intentional or prejudicial means that the juror will not be called as a witness at the post-trial hearing.

### III.

Chief Judge Becker followed in *Morrison,* as we must also follow, the rule of the Eighth Circuit, our controlling court. He rejected an invitation to construe and follow language in particular Tenth Circuit cases in the manner in which counsel for the defendant in *Morrison* and in this case argue.[1] We agree with Chief Judge Becker that the Tenth Circuit cases are readily distinguishable. We further conclude that even if those cases were not distinguishable, they should not be followed. For it is clear that the principal authority upon which the Tenth Circuit "rule" was based has been undermined by subsequent judicial consideration.

In both Photostat Corporation v. Ball (10 Cir., 1964) 338 F.2d 783, 786, and Consolidated Gas & Equipment Co. of America v. Carver (10 Cir., 1958) 257 F.2d 111, 116, the Tenth Circuit cited and relied upon Drury v. Franke, 247 Ky. 758, 57 S.W.2d 969. Indeed, in *Photostat Corporation,* the court quoted with approval the following language from the *Drury* case: "[T]he right of

challenge includes the incidental right that information elicited on the voir dire examination shall be true."

The later Kentucky case of Crutcher v. Hicks (Ky.) 257 S.W.2d 539, 38 A.L.R.2d 620 (1953), however, recognized the dangers of extending the language of *Drury* to lengths advocated by counsel in *Morrison* and in this case. As stated by the annotator in 63 A.L.R. 1059, 1063, "The rule in the *Drury* case has been qualified [by Crutcher v. Hicks]." In *Crutcher,* the Kentucky Court of Appeals stated:

It is true that some of the language of the *Drury* opinion indicates that false information given on voir dire examination which prevents or embarrasses the full, unrestricted exercise of the right of peremptory challenge affects the legality of the panel and the verdict is illegal. [257 S.W.2d at 540, 38 A.L.R.2d at 622]

That court added, however, that:

Even if we accept the extreme and highly technical view which some parts of the opinion would indicate, it does not necessarily follow that false or misleading information elicited on voir dire examination will invariably and in all cases result in an illegal verdict.

The court further stated in *Crutcher* that "there is bound to be a point beyond which reason will not permit us to go in setting aside verdicts upon the falsity of information elicited from jurors." It then stated that "if we accept the premise urged by appellant upon the authority of the *Drury* case, voir dire examination may be transformed into a trap into which the most careful and

---

1. Both in this case and in *Morrison,* counsel cited and relied on language from the Tenth Circuit case Consolidated Gas & Equipment Co. v. Carver (10 Cir., 1958) 257 F.2d 111 and Photostat Corporation v. Ball (10 Cir., 1964) 338 F.2d 783. Counsel in both cases also relied on language from Government of the Virgin Islands v. Bodle (3 Cir., 1970) 427 F.2d 532. Defendants in this case also cite the Tenth Circuit case of John Long Trucking, Inc. v. Greear (10th Cir., 1970) 421 F.2d 125 (which contains a "See" citation to *Photostat Corporation*). They also quote inapposite language from Lewis v. United States, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892), cite Jackson v. United States (1968) 129 U.S.App. D.C. 392, 395 F.2d 615, and quote language from Chief Judge Bazelon's dissent in Daniels v. United States (1966) 123 U.S.App.D.C. 127, 357 F.2d 587, 590.

conscientious juror may fall." And in regard to *Drury,* the court concluded:

> We do not think the opinion establishes the rule which is urged. If it did so, that rule was abandoned in the later case of Olympic Realty Co. v. Kamer, *supra,* 283 Ky. 432, 141 S.W.2d 298.

The annotation appended to *Crutcher* in 38 A.L.R.2d 624, which deals with the subject of the effect of a juror's false or erroneous answer on voir dire, states the following at page 627

> It is generally recognized that a false answer on voir dire which has the effect of depriving counsel of the opportunity to make a proper determination of whether to exercise the right to challenge a juror will not in itself require the granting of a new trial. The courts are almost all agreed that to justify a new trial it must appear that the party seeking it has been prejudiced in his case by the false answers.

Lay v. J. M. McDonald Co. (D.Colo., 1959) 24 F.R.D. 36, establishes that the district courts in the Tenth Circuit do not read the cases decided by that Court of Appeals in the manner that counsel for the defendant in *Morrison* and in this case would have this Court read those cases. In that case, Judge Arraj of the District of Colorado quoted the same portion of 38 A.L.R.2d which we quoted above and concluded that he had improperly allowed particular jurors to be examined at a post-trial hearing before a preliminary foundation of prejudice had been established by independent proof. He ordered the testimony of the jurors stricken and outlined procedures to be followed in all future cases in that district. In regard to his ruling that the testimony of the jurors should not have been received, he stated:

> Determining that this evidence should not be received is merely a variation of the non-impeachment rule that is in force in the federal courts, McDonald v. Pless, 1915, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300; Loney v. United States, 10 Cir., 1945, 151 F.2d

1, a rule to which there are exceptions when it is shown that extraneous matters are brought to the attention of the jury, or outside influences are exerted upon the jury, Mattox v. United States, 1892, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917; Southern Pacific Co. v. Klinge, 10 Cir., 1933, 65 F.2d 85. [24 F.R.D. 40]

Judge Arraj stated that procedures were being established for all future cases for the reason that:

> The problems involved in hearing and determining this motion sharply pointed up the advisability of charting a fair and practical procedural course to be followed in connection with this particular type of motion. Such action is also indicated because of the necessity of preserving the privacy of the jury room, except in special situations, which need not be mentioned here, and to prevent needless badgering of jurors, after they are discharged.

He added that:

> This suggested procedure is based partially on and is supported by Primm v. Continental Casualty Co., D.C.W.D.La.1956, 143 F.Supp. 123, and Pearson v. Gardner Cartage Co., 1947, 148 Ohio St. 425, 76 N.E.2d 67.

In *Primm,* one of the cases upon which Judge Arraj relied, the court was required to deal with the question of whether, on motion for new trial, it could properly consider an affidavit of a claims adjuster which stated that a member of the jury had told him that the jury had improperly arrived at its verdict. After citing the familiar cases which establish the federal rule that a juror may not impeach his own verdict (McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915), is one of the leading cases), the court ruled that the claim adjuster's affidavit could not properly be considered. The Western District of Louisiana was apparently faced with a concerted effort on the part of the Bar to establish a practice under which unsuccessful counsel would routinely be afforded a post-trial hearing

designed to attack an adverse verdict by trying members of the jury for alleged misconduct. On his own behalf, and on behalf of his colleague Judge Hunter, Judge Dawkins stated:

We have concluded that henceforth, in the Western District of Louisiana, we shall consider it improper, unethical, and subject to punishment for contempt, for any one—lawyer, claim agent, or otherwise—to question jurors or discuss with them their deliberations in the Jury Room, without prior permission of the Court, to be granted only upon good cause being shown. . . . This rule is necessitated by an increasing tendency of late, by losing litigants or their representatives, to do the very thing attempted to be done here, and we cannot tolerate it. [143 F.Supp. 127]

In Pearson v. Gardner Cartage Co., *supra,* the other case upon which Judge Arraj relied in Lay v. J. M. McDonald Co., the Supreme Court of Ohio endorsed the following frequently quoted language from the trial court's memorandum denying a motion for new trial based on the failure of three jurors to disclose prior accidents:

It has become a new form of indoor sport for plaintiffs, and/or, defendants after the rendering of an adverse verdict to them to start on a quiet search in an effort to discover some failure upon the part of one or more of the jurors to disclose a prior accident which has grown very hazy in their memory. . . . Jurors are summoned to this court to perform one of the most important but somewhat burdensome duties of their citizenship.

. . . [W]hen their term of service is over, . . . they should be left alone and not be harassed and subjected to embarrassment and annoyance. . . . Somewhere the practice should be stopped and jurors, many of whom make sacrifices to serve as jurors, should be let alone. [76 N.E.2d 77].[2]

The fact that similar motions were recently filed in Morrison v. Ted Wilkerson, Inc., and in this case advocating the adoption by this Court of what unsuccessful counsel conceive is the rule of the Tenth Circuit, neither suggests nor establishes that this Court is presently faced with the sort of concerted effort on the part of the Bar generally which was apparently faced by the District of Colorado and the Western District of Louisiana. On the other hand, the fact that similar motions have been filed in two recent cases makes it appropriate that the Bar again be advised that this Court does not intend to have jurors who serve this Court subjected to what Judge Arraj called "needless badgering" and that jurors will not be called as witnesses at post-trial hearings except under circumstances consistent with principles articulated in *Morrison* and in this case.

## IV.

In *Morrison,* Chief Judge Becker appropriately noted that the jury list was available to counsel before trial and that information concerning the claims of any potential juror was readily available to defendant's counsel through the insurer's index bureau. The files and records in this case show that counsel were given long advance notice of the trial date for this case. Those records also show that

---

2. In affirming the trial court's denial of the motion for new trial, the court stated "We recognize the right of a litigant to be informed fully in all pertinent matters pertaining to prospective jurors to the end that challenges may be intelligently exercised on the ground of suspicion of prejudice or peremptorily, but we recognize also that the real question for a reviewing court is whether substantial justice has been done. Whether substantial justice has been done in a cause such as we have before us is a question in the first instance for the trial court in passing upon a motion for new trial. In other words, the answer rests in the sound discretion of the trial court and where the record discloses no abuse of such discretion, the decision of the trial court should be upheld."

Those principles are consistent with those stated by the Eighth Circuit in Johnson v. Hill (8 Cir., 1960) 274 F.2d 110.

the name of every potential juror was available to all counsel on October 4, 1971, also long in advance of the date the case was initially set for trial (November 1, 1971) and the date trial actually commenced (November 8, 1971).

In the present case counsel had over a month to check prior claims of every potential juror if they deemed such information truly significant for use in the selection of the jury. Defendant's motion for new trial reveals that such investigation was not commenced until the case was lost. Indeed, the defendant expressed the hope in its pending motion that its belated investigation would produce additional grounds upon which it could support its motion for new trial. Defendant stated in its motion that it "anticipates showing misconduct of other jurors, but as of the deadline for filing this motion, investigation thereon is incomplete. Such further findings will be furnished by supplemental suggestions."

■ Supplemental suggestions were later filed but no additional instances of "misconduct" were alleged. Certainly Chief Judge Becker's comment in *Morrison* that "it is not in the interest of justice to have counsel wait until a case is lost to make inquiry in depth concerning the selected jurors to use in securing a new trial, when the information is readily available to counsel before or during trial" is particularly apposite to defense counsel's investigative efforts in this case.

### V.

■ In Johnson v. Hill, *supra*, Judge Matthes stated that a federal trial judge "has the responsibility and duty to so supervise and conduct litigation proceedings as to afford all parties a fair and impartial trial to the end that justice is served." A district judge's discretionary power to grant a motion for new trial must be exercised consistent with that mandate. Every losing party must be afforded a full and fair opportunity to make a showing that some intentional deception on the part of a juror or some other prejudicial conduct did in fact and in law deprive such party of a fair trial. But justice does not require that procedures designed to eliminate unqualified jurors in a particular case be used and considered as some sort of game under the rules of which a losing party may attempt to set aside a verdict fairly obtained in accordance with law.

England has been using the jury system for a very long time. One of the sessions of the London meeting of the American Bar Association last summer was devoted to a discussion of how cases were tried in England. John Matthews, Senior Prosecuting Counsel for the Crown (who presently does "as much, if not more prosecuting of criminal cases than any member of the [British] bar"), had the following to say about how juries are selected in England (10 The American Criminal Law Review 225 at 300 (December 1971)):

> I have heard it said that in England when the jury is sworn, the trial is about to begin; and in America when the jury is sworn, the trial is nearly over. Certainly I understand that the swearing in of a jury in the United States tends to be a somewhat lengthy process. It is not so in this country. We appear to have neither the desire, nor indeed the procedure, for jurors to be investigated as to their suitability. The average time over the years for swearing a jury at the Central Criminal Court is in the region of six and a half to seven minutes. In fact, both sides, the Crown and the defense, are entitled to the names, addresses and occupations of those jurymen on the panel and likely to be called. That is available beforehand to the prosecution and the defense, in fact to anyone, on payment of a shilling. . . .
>
> In practice, the Crown nearly always takes the jury as they find them. In fact, the Crown has a right to stand by all prospective jurors until the panel is exhausted without showing cause. But it is most unusual for the Crown to ask even one to stand by, and then only a good reason suffices,

such as if a juror were illiterate and there were documents to put in evidence in the case, or if he were connected with the case in some way.

The defense has seven peremptory challenges. This is much more frequently used and enables the defense to remove persons who on the face of it may be prejudiced. In addition, the defense has challenges for cause. But the point is that a prima facie cause must be shown before the matter is pursued, evidence called or the juror even questioned.

Mr. Jeremy Hutchinson, a bencher from Middle Temple, with an equally broad trial experience, spoke from the viewpoint of defense counsel. He stated [ibid., 307]:

We come to the objections to the jury, which you have heard about, and I entirely agree with Mr. Matthew. It is a great relief that you do not have to bother with the prejudices of the jury. You will probably disagree with me about that. It makes for a much easier system if you deal with the prejudices of the jury during the trial, in other words, that you create an atmosphere in court—and this depends largely on the judge—which will make those 12 persons approach the case in an unprejudiced way. The whole of our system is based on that. By and large, one accepts the jury for what they are and then works on them, not at trying to dig out the prejudices which of course every individual has. It is a great relief that one does not have to do that in this country.

We do use the seven peremptory challenges, sometimes challenging the jurors on their appearance. In the *Lady Chatterly* trial we challenged as many jurymen as we could because they were all men. My experience is that women are the people to try pornography cases. They are much more sensible and reasonable about these things than men are. Apart from that, one just has to look at jurors or at their occupations, and sometimes challenge them on that basis.

The British practice is obviously in accord with experience which establishes, contrary to what counsel who may have lost a case may think, that any other twelve people off the jury panel would have quite likely reached substantially the same verdict as those who happened to have been chosen. The British practice, as a result of its longer experience, does not even permit the sort of questions presented in *Morrison* and in this case to arise. The real purpose of voir dire examination has been almost eliminated in many American jurisdictions so that experienced counsel, who are granted the right to conduct the voir dire examination with little or no supervision on the part of the judge, frankly recognize that they are, as a practical matter, permitted to make opening argument to the jury in their endless examination of the jury panel and of each individual member of that panel.

The practice in this District, consistent with that followed in the vast majority of the federal district courts, is for counsel, pursuant to our Standard Pretrial Order No. 3, to suggest questions for the judge to ask the panel on voir dire examination. The judge affords counsel an additional opportunity to suggest additional questions before closing the voir dire. Acceptance of the sort of rule suggested by unsuccessful counsel in *Morrison* and in this case would force radical changes in the manner in which voir dire examination has long been conducted in this District. For acceptance of the suggested rule would, in the language of the *Crutcher* case, transform voir dire examination "into a trap" and would almost automatically require a second trial of every case tried by jury. It should be obvious that the complications which would flow from what counsel call the Tenth Circuit rule would cause the judges of this Court to limit the questions on voir dire sole-

ly to those which would reveal the basis of a strike for cause.

We can not believe that such a departure from the established practice of this Court would be acceptable to the Bar. We avoid the necessity for any change by again refusing to accept counsel's invitation to adopt a new and different rule.

■■ It should be clear from what we have said that it is premature for defense counsel to anticipate that, without making an appropriate preliminary showing, they will be permitted to call either of the jurors whom they have charged with "misconduct," as witnesses at the initial post-trial hearing in this case. This case will, of course, be set for hearing in order to afford the defendant an appropriate opportunity to establish an initial foundation of either intentional deception or other prejudice as a prerequisite upon which counsel may base a subsequent application for further hearing at which some juror may be summoned as a witness.

The burden of proof at the scheduled hearing will rest upon the defendant to offer evidence, which, if true, would establish that the particular juror's alleged failures to respond to voir dire questions were either intentional or prejudicial. Our direction of further proceedings is designed to facilitate the conduct of the hearing.

For the reasons stated, it is

Ordered that defendant's pending post-trial motions should be and are hereby set for plenary evidentiary hearing at 4:00 p. m. on Thursday, March 2, 1972. It is further

Ordered that counsel for the defendant shall promptly make application for subpoena duces tecum in order to obtain copies of any hospital or other medical records which they may wish to obtain in regard to this case. Any records so obtained shall be made available to counsel for both parties but shall not be further revealed to any other person without leave of court. It is further

Ordered that on or before Monday, February 28, 1972, counsel for defendant shall prepare, serve, and file a list of post-trial hearing exhibits to which shall be attached separately numbered copies of all documentary evidence which they intend to adduce in evidence at the hearing. Any medical records attached to defendant's list shall be placed in a sealed envelope which shall carry a notation "Not to be opened without leave of Court." It is further

Ordered that counsel for the plaintiff shall make appropriate investigation before the hearing in regard to the authenticity of the documentary evidence served upon him by defendant's counsel in order to be in a position at the hearing to admit or deny the authenticity of said documentary evidence. It is further

Ordered that on or before Wednesday, March 1, 1972, counsel for the defendant shall prepare, serve, and file appropriate affidavits of any and all witnesses other than any member of the jury whom defendant intends to call as a witness at the hearing. Such affidavits shall fully and fairly set forth the substance of the testimony which defendant expects each particular witness to give at the hearing. It is further

Ordered that neither counsel for either party nor any other person in any way connected with either party shall attempt to contact any member of the jury for the purpose of obtaining an affidavit or for any other purpose without first obtaining leave of Court. No member of the jury shall be subpoenaed or called as a witness at the March 2, 1972 hearing.