ISHEE, J., for the Court:
 

 ¶ 1. In October 2003, Sandy Ball slipped and fell while working for her employer, Ashley Furniture Industries, in Ecru, Mississippi. Ball filed a petition to controvert in April 2004 with the Mississippi Workers’ Compensation Commission (the Commission) against Ashley Furniture Industries and its carrier, Employee Insurance of Wausau (collectively referred to as Ashley Furniture), claiming injuries to her chest and right knee that she sustained from her fall. In November 2004, Ball filed for workers’ compensation benefits to cover a requested surgery to her right knee. Ashley Furniture denied the benefits, and Ball asked that the Commission compel Ashley Furniture to pay for the surgery and rehabilitation for her knee. Ashley Furniture contested the motion, claiming that Ball suffered from a preexisting, degenerative condition which was temporarily aggravated by her fall in October 2003, but the aggravation ceased in December 2003. Ball did not contest the preexisting, degenerative condition, but she argued that the
 
 *1253
 
 aggravation was permanent and required ongoing treatment provided by Ashley Furniture. After discovery was conducted and evidence was submitted, the parties agreed to waive their right to a hearing and allow an administrative judge (AJ) to review the evidence and rule on the case. The AJ determined that Ball had a preexisting, degenerative condition in her right knee that was temporarily aggravated by her fall in October 2008. The AJ further determined that Ball’s work-related injury ceased in December 2003, and Ashley Furniture was not responsible for treatment of Ball’s injury after December 2008. Ball was then granted a review of the AJ’s order by the Commission, which affirmed the AJ’s decision in December 2008. Ball appealed the Commission’s findings to the Pontotoc County Circuit Court. The circuit court affirmed the Commission’s findings in September 2010. Aggrieved, Ball now appeals. Finding no error, we affirm.
 

 STATEMENT OF FACTS
 

 ¶ 2. In October 2003, Ball suffered injuries to her chest and right knee after she slipped and fell while working for Ashley Furniture. She went to the emergency room the day after her fall, where she was told that her chest was bruised and that there were no obvious fractures or abnormalities in her knee. Shortly thereafter, she met with Dr. Johnny Mitias, alleging continued right-knee pain. Dr. Mitias became Ball’s treating physician. On December 23, 2003, Dr. Mitias reviewed an MRI of Ball’s knee; he determined that she suffered from early patellofemoral compartment degeneration, a preexisting, degenerative condition in her right knee. In his report, Dr. Mitias stated that Ball’s condition would continue to worsen due to the degenerative process. He further stated that her right-knee pain was not wholly or directly related to her work injury. Dr. Mitias concluded his December 23, 2003 report by releasing Ball to regular duty with a zero-percent-impairment rating. In April 2004, Ball filed a petition to controvert with the Commission against Ashley Furniture for workers’ compensation payments due to her ongoing disability in her right knee.
 

 ¶ 3. Ball returned to Dr. Mitias in October 2004 with another complaint of pain in her right knee, at which point Dr. Mitias discussed the possibility of surgery. However, Ball’s medical insurance had changed since her last visit to Dr. Mitias, and Dr. Mitias referred her to Dr. William Rice for further treatment. Thereafter, Ball requested that Ashley Furniture cover the costs of surgery on her right knee, which Ashley Furniture denied. In November 2004, Ball filed a motion to compel medical treatment, requesting that the Commission order Ashley Furniture to pay for the surgery.
 

 ¶ 4. In its response, Ashley Furniture did not dispute that Ball had suffered a work-related injury to her right knee. However, based on Dr. Mitias’s reports, Ashley Furniture argued that Ball’s injury was a temporary aggravation of the preexisting condition in her right knee, as opposed to Ball’s assertion that she had suffered a permanent aggravation of a preexisting condition. Ashley Furniture further claimed that because Dr. Mitias had released Ball back to work with a zero-percent-impairment rating on December 23, 2003, Ball was no longer entitled to benefits from Ashley Furniture, including the proposed surgery, after December 23, 2003.
 

 ¶ 5. After a hearing on the motion, the AJ issued an order on June 10, 2005, holding the issue in abeyance pending Dr. Mi-tias’s deposition. The parties then conducted discovery, including Dr. Mitias’s deposition. On February 2, 2006, the Commission scheduled a hearing on the merits to take place on May 9, 2006. Dur
 
 *1254
 
 ing a prehearing conference with the AJ on May 5, 2006, counsel for both parties agreed that the sole issue in controversy was whether Ball had sustained a temporary or a permanent aggravation of her preexisting condition. The parties further agreed that this issue would be resolved by Dr. Mitias’s testimony as Ball’s treating physician. Ball’s counsel then suggested that a hearing was unnecessary and that the case should be decided by the AJ based on Dr. Mitias’s deposition and Ball’s medical records. Ashley Furniture’s counsel agreed to submit the case to the AJ for a final determination. Subsequently, the parties agreed to close the record in the case on May 5, 2006, and the pending hearing was cancelled.
 

 ¶ 6. However, the record indicates that Ball’s counsel later refused to sign the proposed stipulation waiving the hearing, and her counsel attempted to submit an additional written medical opinion and additional medical records from Dr. Rice. The opinion and records had never been filed with the Commission, and they did not include a medical-records affidavit, contrary to the requirements of the Commission’s Procedural Rules. Accordingly, in November 2006, Ashley Furniture’s counsel moved to strike the medical records because they were untimely and did not comply with the procedural rules. Ashley Furniture also requested that the Commission enforce the parties’ agreement regarding the waiver of a hearing and the submission of the issues for a determination on the merits.
 

 ¶ 7. After consideration of Ashley Furniture’s motion and Ball’s response, the AJ granted the motion to strike and compel in March 2007. In her order, the AJ reiterated the parties’ prior agreement at the prehearing conference that the issue as to whether or not Ashley Furniture was required to provide further medical treatment to Ball was dispositive since Ball’s case hinged on whether she suffered a temporary or a permanent aggravation of the preexisting, degenerative condition in her right knee. After reviewing the evidence, the AJ issued an order on July 18, 2008, wherein she concluded that the injury was a temporary aggravation of Ball’s preexisting, degenerative condition and that the temporary aggravation ended on December 23, 2003, when Dr. Mitias released Ball back to work with a zero-percent-impairment rating. Accordingly, the AJ determined that Ashley Furniture was not responsible for providing Ball any benefits after December 23, 2003, including the proposed surgery.
 

 ¶ 8. Thereafter, Ball appealed the AJ’s order to the Commission. The Commission granted Ball’s request and scheduled a hearing on the matter. After hearing oral arguments from both parties and reviewing the evidence, the Commission affirmed the AJ’s order in December 2008. Ball then appealed the Commission’s findings to the circuit court. On September 23, 2010, the circuit court issued a lengthy order affirming the Commission’s findings. Aggrieved, Ball now appeals, claiming the following: (1) the Commission committed prejudicial and reversible error in upholding the AJ’s finding that Ashley Furniture was not responsible for Ball’s medical treatments to her right knee after December 23, 2003; (2) the Commission’s order is not based upon substantial evidence because the AJ’s ruling was founded on inapplicable law; (3) the Commission failed to resolve all issues of doubt in the medical testimony submitted; and (4) the Commission improperly upheld the AJ’s decision to exclude the written medical opinion and medical records from Dr. Rice. Finding no error, we affirm.
 

 STANDARD OF REVIEW
 

 ¶ 9. “The ... Commission sits as the ‘ultimate finder of facts’ in deciding
 
 *1255
 
 compensation cases, and therefore, ‘its findings are subject to normal, deferential standards upon review.’ ”
 
 Pilate v. Int’l Plastics Corp.,
 
 727 So.2d 771, 774 (¶ 12) (Miss.Ct.App.1999) (quoting
 
 Natchez Equip. Co. v. Gibbs,
 
 623 So.2d 270, 273 (Miss.1993)). This Court will only reverse the findings of the Commission if the findings are “clearly erroneous.”
 
 J.R. Logging v. Halford,
 
 765 So.2d 580, 583 (¶ 13) (Miss.Ct.App.2000) (citing
 
 Evans v. Cont’l Grain Co.,
 
 372 So.2d 265, 269 (Miss.1979)). A finding is clearly erroneous if, “although there is some slight evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made by the Commission in its findings of fact and in its application of the [Workers’ Compensation] Act.”
 
 Id.
 
 However, “this Court reviews matters of law de novo, while according the interpretation of the Commission great weight and deference.”
 
 Natchez Equip. Co., Inc.,
 
 623 So.2d at 273 (citation omitted).
 

 DISCUSSION
 

 I. Ashley Furniture’s Responsibility for Ball’s Medical Treatment
 

 ¶ 10. Ball first argues that the Commission was clearly erroneous in affirming the AJ’s finding that Ashley Furniture was no longer responsible for Ball’s medical treatments after December 23, 2003, and in ruling that Ball had suffered a temporary aggravation of a preexisting, degenerative condition. We disagree.
 

 ¶ 11. Ball’s treating physician, Dr. Miti-as, determined that Ball suffered from a preexisting, degenerative condition in her right knee. The record reflects that on December 23, 2003, Dr. Mitias stated:
 

 At this point[,] I told Ms. Ball that there is really not much we can do about this. I told her that [the pain in her right knee] will continue to slowly, but surely[J worsen due to the fact that this is just a degenerative process. It really doesn’t have that much to do with her injury. I’ll see her back on [an as-needed] basis. She is released to regular duty with a 0% impairment rating.
 

 ¶ 12. The AJ also reviewed Dr. Mitias’s deposition, noting that “[Dr. Mitias] confirmed that [Ball’s] current problems were not related to her work injury but to a degenerative process,” and “the problem she had was an architectural problem in the way she was made. It had nothing to do with her work injury.” When asked about the aggravation caused to Ball’s preexisting condition due to her work injury, Dr. Mitias stated:
 

 With this type of problem, I think she could have bumped it at home, could have, you know, taken a step off a curb on a street, I mean, it was going to be a problem eventually, even — maybe the next day or two days or two years. It is very — it is extremely variable when this starts to be a problem for them, but, you know, just because she really fell at work, I mean, we got her back to her baseline, which is where I think she would have been regardless[,] and at that point you have to say that’s all you can do.
 

 Dr. Mitias concluded that Ball’s work injury was a temporary aggravation of her preexisting condition.
 

 ¶ 13. In her order, the AJ conducted an extensive analysis of Ball’s medical records and Dr. Mitias’s opinions. Because the AJ based her decision on the strong evidence of Ball’s treating physician’s remarks and Ball’s medical records, we cannot say that the Commission was clearly erroneous in affirming the AJ’s findings. This issue is meritless.
 

 II. Applicability of Case Law Regarding Preexisting Condition
 

 ¶ 14. Ball next asserts that the Commission erred by upholding the AJ’s deci
 
 *1256
 
 sion because the decision was improperly-based on
 
 Rathborne, Hair & Ridgeway Box Co. v. Green,
 
 237 Miss. 588, 115 So.2d 674 (1959), and should have been based on
 
 Hedge v. Leggett & Platt, Inc.,
 
 641 So.2d 9 (Miss.1994).
 
 Rathbome
 
 provides well-settled workers’ compensation law regarding the compensability of work-related aggravations of preexisting conditions as follows:
 

 The rule in this [s]tate is that when a pre-existing disease or infirmity of an employee is aggravated, lighted up, or accelerated by work-connected injury, or if the injury combines with the disease or infirmity to produce disability, the resulting disability is compensable. A corollary to the rule just stated is that when the effects of the injury has [sic] subsided, and the injury no longer combines with the disease or infirmity to produce disability, any subsequent disability attributable solely to the disease or infirmity is not compensable.
 

 Rathborne,
 
 237 Miss. at 594, 115 So.2d at 676.
 

 ¶ 15. Ball asserts that Rathbome’s applicability is “based upon whether or not the injured worker is able to return to work following recovery from the work injury,” pursuant to
 
 M.T. Reed Const. Co. v. Garnett,
 
 249 Miss. 892, 164 So.2d 476 (1964). However, we cannot find error in the AJ’s application of
 
 Rathbome
 
 to Ball’s case. While it is important to determine a claimant’s ability to work after recovery from an injury, Dr. Mitias’s opinion clearly indicates that Ball was fully able to return to work on December 23, 2003, with a zero-pereent-impairment rating. Dr. Miti-as’s deposition testimony and Ball’s medical records reflect that while Ball injured her right knee on the job, she made a full recovery back to her “baseline” medical condition, which included her preexisting, degenerative condition. Dr. Mitias also testified that any loss of functional ability suffered by Ball would be the natural result of the degenerative condition present in Ball’s right knee prior to the accident, and not due to the accident itself. As such, this issue has no merit.
 

 III. Resolution of Doubt in the Medical Testimony
 

 ¶ 16. In her order, the AJ determined the following:
 

 1. [Ball] suffered from a preexisting condition and had an aggravation of the preexisting condition while working for [Ashley Furniture]. In Dr. Mitias’[s] deposition, both parties had an opportunity to develop the doctor’s opinion. Under questioning from [Ball’s] counsel, Dr. Mitias indicated that [Ball’s] right knee problems were aggravated by the work injury and that she did suffer a temporary increase in pain and symptoms from the work injury.
 

 2. [Ball’s] aggravation was temporary and [Ashley Furniture is] not responsible for benefits after December 23, 2003. In his note of December 23, 2003, Dr. Mitias indicated that [Ball’s] problem was degenerative[,] and “it really doesn’t have that much to do with her injury.” In his deposition, Dr. Mitias consistently and repeatedly testified that it was probable [Ball] would have been in the same condition in 2004 due to the degenerative condition, regardless of whether the work injury had ever occurred.
 

 3. The effects of the aggravation have subsided, and the aggravation is no longer combining with the disease or infirmity to produce disability. Therefore, [Ball’s] subsequent disability is attributable solely to the degenerative condition^] and [it] is not compensable. [Ashley Furniture is] not responsible for the proposed surgery, since Dr. Mitias clearly testified that the surgery was not necessitated by the work injury.
 

 ¶ 17. Ball now argues that the AJ failed to resolve any doubt or ambiguity in
 
 *1257
 
 the medical testimony in favor of Ball because Dr. Mitias purportedly did not completely rule out Ball’s work injury as a contribution to her current condition. However, having reviewed all applicable testimony and evidence, we cannot say that any doubt or ambiguity in the medical testimony existed. On the contrary, a thorough review of the record supports the AJ’s conclusion that the medical evidence fully supported a finding that Ball’s disability in her right knee is not causally related to her fall at work.
 

 ¶ 18. Dr. Mitias stated in clear unequivocal terms that Ball suffers from a preexisting, degenerative condition which was only temporarily aggravated by her fall at work and which was resolved as of December 23, 2003. Dr. Mitias further testified that “the problem [Ball] had was an architectural problem in the way she was made. It had nothing to do with her work injury.” As such, Dr. Mitias did, in fact, rule out any contribution from Ball’s work injury to her current condition.
 

 ¶ 19. Furthermore, with regard to Ball’s contention that Dr. Mitias left open the possibility of a connection between her fall at work and her current disability, the Mississippi Supreme Court has held that credible evidence with probative value is evidence “which can be stated with reasonable medical certainty.”
 
 Magnolia Hosp. v. Moore,
 
 320 So.2d 793, 799 (Miss.1975). Although Dr. Mitias might not have used the phrase “reasonable medical certainty” in his statement that “[Ball’s disability] had nothing to do with her work injury,” the supreme court clarified its holding in
 
 Magnolia
 
 by stating that to exclude medical testimony because it does not include the words “reasonable medical certainty” would be a “semantic trap and the failure to voice it is not used as a basis for exclusion without analysis of the testimony itself.”
 
 Catchings v. State,
 
 684 So.2d 591, 597 (Miss.1996) (citing
 
 LeMaire v. United States,
 
 826 F.2d 949, 954 (10th Cir.1987)).
 

 ¶ 20. Accordingly, we fail to see any doubt or ambiguity in Dr. Mitias’s testimony that would indicate Ball’s current alleged disability has any possible connection to Ashley Furniture. We find this issue is without merit.
 

 IY. Exclusion of Medical Evidence from Dr. Rice
 

 ¶ 21. Finally, Ball argues that the AJ’s exclusion of Dr. Rice’s handwritten medical opinion and his medical records on Ball was erroneous. The Commission’s Procedural Rule 9 governs the introduction of evidence and discovery. The subsection under Procedural Rule 9 titled “Medical Records and Affidavits” controls, among other things, the admissibility of medical evidence at a hearing as a substitute for the live testimony of a physician. Procedural Rule 9 outlines several requirements that a party must fulfill in order to admit medical evidence, including medical opinions and medical records. In particular, Procedural Rule 9(l),(3)-(4) demands that a party moving to admit medical evidence is required to give the opposing party written notice at least thirty days prior to a scheduled hearing, and the moving party must attach a sworn statement from either the physician or the physician’s medical-records custodian stating that the requisite-attached medical record is a true and correct copy of a medial record kept in the regular course of the physician’s practice. Furthermore, Procedural Rule 9(7) states: “The Commission intends for [Procedural Rule 9] to pertain to narrative notes and reports composed and generated by the physician in the ordinary course of medical practice.”
 

 ¶ 22. Here, Ball blatantly failed to meet the requirements of Procedural Rule 9 in her attempted admission of new medical
 
 *1258
 
 evidence from Dr. Rice. On August 9, 2006, Ball’s counsel stated that he was developing new medical evidence from Dr. Rice and would submit the same to the AJ. Accordingly, Ball’s counsel sought to introduce Dr. Rice’s medical evidence well after the parties’ initially scheduled hearing of May 9, 2006. In fact, Ball failed to disclose the mere existence of medical evidence from Dr. Rice at the prehearing conference on May 5, 2006. It was not until after the hearing had been cancelled and the parties and the AJ had agreed that a determination would be made based only on Ball’s then-submitted medical records and Dr. Mitias’s deposition that Ball moved to admit Dr. Rice’s handwritten notation dated May 22, 2006, and the medical records from his one-time evaluation of Ball on November 19, 2004.
 

 ¶ 23. Additionally, Ball did not include a sworn statement from either Dr. Rice or his medical-records custodian affirming that the opinion and the records were true and correct copies of medical records kept in the regular course of Dr. Rice’s practice. As stated in the AJ’s order, the “report was not associated with any specific treatment provided [to Ball] and constituted inadmissible hearsay.”
 

 ¶ 24. Moreover, the parties had agreed to close the record in the case on May 5, 2006, and they had also agreed that the AJ would only consider the medical records already submitted, as well as Dr. Mitias’s deposition testimony. The AJ determined that Dr. Rice’s medical evidence was contrary to the agreement reached by the parties on May 5, 2006, and were therefore inadmissible. We agree and find that the Commission properly upheld the AJ’s exclusion of Dr. Rice’s medical evidence from the record. This issue is without merit.
 

 ¶ 25. THE JUDGMENT OF THE PONTOTOC COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 LEE, C.J., IRVING AND GRIFFIS, P.JJ., MYERS, BARNES, ROBERTS, CARLTON AND RUSSELL, JJ., CONCUR. MAXWELL, J., NOT PARTICIPATING.